Ex parte BROWNE.

(Circuit Court S. D. New York. August 14, 1906.)

EXTRADITION—INTERNATIONAL—RIGHTS OF ACCUSED AFTER EXTRADITION.

In view of Rev. St. §§ 5272, 5275 [U. S. Comp. St. 1901, pp. 3595, 3596], which place a legislative construction on all extradition treaties requiring that a person surrendered thereunder shall not be arrested or tried for any other offense than that which was charged in extradition, until he shall have had a reasonable time to return unmolested to the country from which he was brought, a person extradited from Canada to the United States under the Treaty of 1889 for trial on a pending indictment cannot be seized by officers of the. United States on his arrival in this country and imprisoned in execution of a prior judgment against him on a different charge.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Extradition, §§ 22–24; vol. 14, Cent. Dig. Criminal Law, § 195.]

On Writ of Habeas Corpus Obtained by Charles C. Browne.

Henry L. Stimson, Dist. Atty., and W. Wickham Smith, Special Dist. Atty., for the United States.

Black, Olcott, Gruber & Bonynge, for relator.

HOUGH, District Judge. In the year 1903 several indictments were found by the grand jury of this district against the relator. In one he was charged with conspiring to defraud the United States of duties upon imports, and in another with procuring the admission of goods into the United States in violation of Revised Statutes, § 5444 [U. S. Comp. St. 1901, p. 3677]. Upon the conspiracy charge Browne was duly convicted and sentenced to a term in the prison at Sing Sing. This conviction was affirmed upon appeal, and an application for certiorari to the Supreme Court refused. Upon the charge under section 5444 he has never been tried. Browne, having been released on bail pending appeal, fled to Canada after the affirmance of his conviction. Thereupon the United States demanded his extradition as a convict, pursuant to our extradition convention of 1889 with the government of Great Britian. This demand was refused. Immediately a new demand was made, based upon the indictment for violation of section 5444. This requisition Canada honored, and delivered Browne to the proper officer, with whom he was traveling when he was arrested on the railroad train under a warrant based upon the conspiracy conviction, taken away from the extradition officer who had him in charge, and lodged in Sing Sing; whence he has been brought under this writ alleging that his incarceration is in violation of the obligations of the United States under the Ashburton Treaty of 1842 as extended by the above-mentioned convention of 1889, and therefore in violation of the supreme law of the land. The return to the writ shows no warrant for holding Browne in prison, other than his regular commitment under the conspiracy conviction.

Counsel have discovered no instance later than Miller's Case (C. C.) 23 Fed. 32, of the extradition of a convict upon an untried charge followed by imprisonment under his conviction. Miller was before Judge Acheson in 1885, and governmental action substantially identical with that taken here was distinctly approved. The celebrated case of Rauscher, 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425, was argued early in 1886, and the court does not advert to Judge Acheson's ruling. This omission of so important an instance from so thorough a review of the whole subject of extradition can only have occurred because Miller's Case was not reported in time for consideration. It is now brought forward as justification for the manner of Browne's incarceration. Such claim cannot be sustained, for Miller may have been, and Browne may be, lawfully detained, but not for the reasons advanced by Judge Acheson, whose whole opinion is based on the decisions carefully considered, and decisively overruled in the Rauscher Case.

The learned counsel for the government remind the court that since 1885 no facts like the present have arisen for judicial consideration, and, while admitting that the judgment in Rauscher's Case has for 20 years rendered it unlawful to try a person surrendered in extradition for any offense committed prior to surrender other than that specified in the demand for extradition, assert (1) that upon the true construction of the Rauscher Case it is lawful to apprehend an escaped convict, even though at the time of apprehension he has been brought within this country solely by virtue of a demand in extradition wholly unconnected with the crime for which he became a convict; and (2) that such right to seize convicts is especially secured to our government in its relations with the king of Great Britain and Ireland by the terms of the Ashburton Treaty of 1842 as supplemented by the extradition convention of 1889, the latter instrument, be it noted, having come into existence since the Rauscher decision. The arrest of Browne under the circumstances above recited certainly constitutes a vigorous assertion of this doctrine. Counsel have, respectively, laid stress upon the manner of Browne's flight to his Canadian asylum, and the "trick" of getting him within the reach of the warrant now holding him in prison, upon the pretense of wanting him upon another charge. These considerations, however, are all circumstances of inflammation, for neither the manner or time of Browne's escape nor the intent behind his enforced return are material to the present inquiry. They suggest subjects fit for diplomatic, rather than for judicial, consideration.

The sole question here presented is not whether that which has been done is wrong or tricky, or injudicious, but whether it is unlawful. Concededly the facts submitted are very different from those considered in the case of Rauscher, but I cannot concur in the narrow view of that decision now urged upon me. The Supreme Court there found great contrariety of opinion not only among judges, but diplomats, as to what might or might not be done

to persons delivered upon demands in extradition. It had under especial consideration the Ashburton Treaty, which on these points is entirely silent; and it must have been aware that the action of this court in the case of Lawrence (so elaborately considered in the Rauscher opinion) had resulted in a refusal on the part of Lord Derby to honor our demand for the surrender of one Winslow unless the United States would especially covenant to do nothing and permit nothing to be done to Winslow, except try him for the of-·fense for which his surrender was requested—a position in which Secretary Fish found it inconsistent with the dignity of this country to acquiesce. Such situation called for and received what I must regard as a declaration of principles by a co-ordinate branch of our government and a chart in all matters of extradition, not grounded upon mere legality, but resting on foundations of national honor. The sum of the doctrine declared is, in the language of the court:

"This right [of extradition], the right to demand it, the obligation to grant it, the proceedings under which it takes place, all show that it is for a limited and defined purpose that the transfer is made. It is impossible to conceive of the exercise of jurisdiction in such a case for any other purpose than that mentioned in the treaty, and ascertained by the proceedings under which the party is extradited, without an implication of fraud upon the rights of the party extradited and bad faith to the country which permitted his extradition. No such view of solemn public treaties between the great nations of the earth can be sustained by a tribunal called upon to give judicial construction to them."

Nor are decisions wanting in which the broadest significance has been given to the judgment containing these vigorous expressions.

In Re Reinitz (C. C.) 39 Fed. 204, 4 L. R. A. 236, Judge Brown of this district discharged from custody a man arrested on civil process immediately after his acquittal of the charge of forgery upon which he had been extradited, remarking that the case of Rauscher had definitely settled that an extradited person "cannot be arrested or tried" for any offense committed prior to extradition other than that for which he had been surrendered. In re Baruch (C. C.) 41 Fed. 472, the· same distinguished jurist quoted the above extract from the Rauscher opinion and applied it to the case of one who had been haled from New Jersey to New York in order that he might be extradited, and upon his discharge and before returning to New Jersey had been arrested in civil process for the same cause as that for which his extradition had been demanded. He further referred with approval to the opinion of Governor Hill of this state in the case of Hope (Sup.) 10 N. Y. Supp. 28, who, speaking of the Rauscher judgment, says:

"The true theory which now seems to be firmly established is that a state should not be allowed to obtain jurisdiction of the fugitive from justice and then to take advantage of jurisdiction thus obtained and to use it for another and a different purpose."

In Hall v. Patterson· (C. C.) 45 Fed. 352, the late Judge Green of New Jersey expressed his view of the Rauscher Case by saying that

after one delivered in extradition be tried and acquitted "he is entitled to have granted to him a reasonable time in which to leave the country before he can be arrested and held to answer for any other crime committed before extradition."

It is also to be remembered that the Rauscher judgment proceeds, not only "upon the ground of a right given impliedly by the terms of the treaty between the United States and Great Britain" (although the Ashburton Treaty is entirely silent on the subject), but also given "expressly by the acts of Congress in the case of a fugitive surrendered to the United States by a foreign nation." Lascelles v. Georgia, 148 U. S. at 542, 13 Sup. Ct. 687, 689, 37 L. Ed. 549. The acts referred to are sections 5272 and 5275, Rev. St. [U. S. Comp. St. 1901, pp. 3595, 3596]; and they remain to-day as they were in 1886, a "congressional construction" of extradition treaties (i. e., of all extradition treaties), "binding upon the judiciary," such construction requiring that a person brought into this country upon extradition shall not be arrested or tried for any other offense than that with which he was charged in extradition "until he shall have had a reasonable time to return unmolested to the country from which he was brought." U. S. v. Rauscher, supra. It is idle to attempt distinctions between convicts and persons indicted, arrests on mesne process and final commitments, between civil and criminal proceedings. The Rauscher judgment, as well as subsequent interpretations thereof, fully warrant the doctrine approved by Sir Edward Clarke in his work on Extradition, that the person extradited cannot be "detained" for any other than the extradition offense until he has had a reasonable opportunity to return to the delivering country.

It remains to consider the contention that the rule above set forth has been (as to Great Britain at all events) abrogated by the convention of 1889. If it were not for sections 5272 and 5275, Rev. St., and the construction given thereto by the Supreme Court, the argument would have more weight; but it was distinctly held that these statutes alone were sufficient to uphold the doctrine of the Rauscher Case, and Justice Gray gave his adherence thereto solely upon that construction. Unless, therefore, the convention of 1889 has abrogated the statutes as well as superseded the doctrine based upon the right "implied" from the Ashburton Treaty, the rule must remain the same.

Article 2 of this convention, after providing that no surrender shall take place if the offense in respect of which surrender is demanded "be one of a political character," declares that:

"No person surrendered by either of the high contracting parties to the other shall be triable or tried or be punished for any political crime or offence or for any act connected therewith, previously to his extradition."

Article 3 declares that:

"No person surrendered by or to either of the high contracting parties shall be triable or be tried for any crime or offence committed prior to his extradition other than the offence for which he was surrendered, until he shall have had an opportunity of returning to the country from which he was surrendered."

Article 7 declares that:

"The provisions of the said 10th article (i. e., of the Ashburton Treaty), and of this convention, shall apply to persons convicted of the crimes therein respectively named and specified whose sentence therefor shall not have been executed."

It is strenuously contended that the omission of the word "punished" from article 3, above quoted, leaves the United States free to punish by imprisonment a convict found within its borders, even if at the time of his apprehension he be within the country solely under a warrant in extradition. But these treaty provisions are primarily the obligations of the contracting governments each to the other. They do not purport to repeal or modify any law of the United States, and they are not inconsistent with the continued enforcement of sections 5272 and 5275, Rev. St., which constitute a rule of conduct obligatory upon the officers of the United States, whose conduct is here questioned. It is, of course, true that a statute inconsistent with a treaty is repealed by implication. It is too clear for argument that there is no such implication in this instance. I am therefore of opinion that without further interpreting the language of the convention the governmental contention is untenable in the light of the above referred to sections of the Revised Statutes as still authoritatively interpreted by the case of Rauscher.

It is doubtless true that the insertion of the word "punished," in article 3 of the convention, would have rendered that instrument clearer, and the argument is not without force that its omission is notable in view of its presence in many other extradition treaties negotiated with other nations at or about the same time. As, however, I regard the general doctrine laid down in the case of Rauscher as based upon existing statutes of the United States to be entirely conclusive of this matter, I need not pursue the consideration of the convention of 1889 further than to say that it appears to me very doubtful, in view of the provisions of article 7, that article 3 should be so construed as to permit either of the contracting parties to do by indirection under that article what neither could do openly under article 7, and that I consider the insertion of the word "punished," in article 2, as no more than a recognition of the historical fact that political offenses are frequently punished without trial.

I have given this cause consideration proportioned rather to its importance than its apparent difficulty, and conclude that in my opinion, as long as the present federal statutes on the subject remain in force, unrepealed either by Congress or the express language of a treaty, there is no authority of or within these United States having any right or power to seize, arrest, confine, or detain any person extradited in pursuance of treaty provisions and for a specific offense, for any other offense, crime, or cause whatsoever (committed or existing before his extradition) except for that specific offense, crime, or cause by reason of which the extradition has been granted; and, further, that this doctrine rests, not only nor principally upon the civil rights or personal privileges of a fugitive criminal who has been returned in accordance

with an increasingly civilized international law, but upon the highest grounds of national honor, imposing upon this government and upon all persons subject to its rule the obligation to deal with the human being intrusted to them by a friendly foreign power, only in respect of the matter by reason of which he was so intrusted.

Let the relator be discharged.